**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

JAMES TOLLE,                                    )
                                                )
                    Plaintiff,                  )
                                                )
v.                                              )
                                                )        Civil Action No. l:20-cv-363 (LMB/MSN)
GOVERNOR RALPH NORTHAM, et al.,                 )
                                                )
                                                )
                    Defendants.                 )

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

### INTRODUCTION

The COVID-19 pandemic has raised extraordinarily difficult questions for elected officials and other policymakers. The virus is deadly and spreads with devastating ease. Well-intentioned people can unknowingly infect others. There is no vaccine or cure. Millions have been infected and hundreds of thousands have already died.

As Justice Antonin Scalia observed, "[w]e have in our state and federal systems a specific entity charged with responsibility for initiating action to guard the public safety. It is called the Executive Branch." *Schenck v. Pro-Choice Network*, 519 U.S. 357, 393 (1997) (Scalia, J., dissenting). Virginia is no different. As Governor, Dr. Ralph S. Northam was elected by the people to be the Commonwealth's chief executive. And, in the Virginia Services and Disaster Law of 2000, Va. Code Ann. § 44-146.13 *et seq.* (Emergency Law), the General Assembly named the Governor the Director of Emergency Management and vested with him "emergency powers." §§ 44-146.14(a)(2), 44-146.17.

1

Pursuant to that authority—and assisted by a team of experts, including the State Health Commissioner—Governor Northam has taken good-faith, evidence-based measures since March to slow COVID-19's spread, save lives, and protect public health. As knowledge about the virus has evolved, so too has the Governor's approach, and he has worked with public health officials to ease restrictions as it is safe to do so.

In this case, *pro se* Plaintiff takes issue with Executive Order 55, an order issued in March and no longer in force, because he "was a practicing member in lay ministry at his Church in Gainesville Virginia until Defendant Northam's social distancing orders caused Tolle's Church to stop offering public services." Compl. ¶ 5 (ECF No. 1, PageID# 2). Based on this allegation, Plaintiff claims violations of his rights to free exercise of religion and to assemble. But these claims are moot because religious services have not been subject to any capacity restrictions since Phase Three of the Governor's reopening plan went into effect on July 1. Thus, Plaintiff cannot meet Article III's basic requirements with respect to the temporary gatherings restriction: Plaintiff can neither demonstrate standing nor show the adversity necessary to establish a case or controversy. And, Plaintiff's challenge to the now-expired restrictions fails as a matter of law because Plaintiff has no need for the exercise of the Court's equitable powers to protect him from measures that are no longer in force.

In any event, all of Plaintiff's claims fail because the Commonwealth of Virginia has not waived its sovereign immunity, and the Eleventh Amendment bars this Court from enjoining the Governor in the exercise of his official duties.

Finally, even if Executive Order 55 were still in force, it did not single out religious services or clergy nor prevent group religious services online or even in-person at their place of worship so long as social distancing requirements are maintained. And the suggestion that the

2

temporary gatherings restriction was unconstitutional because it prevented groups of 10 or more people from physically gathering inside a church or elsewhere ignores the reality that motivated the temporary gatherings restriction in the first place: the fact that, given the nature of the COVID-19 pandemic, large in-person gatherings are devastatingly effective in transmitting a deadly disease. At bottom, the restriction on gatherings operated only *temporarily* toward this goal of stemming the spread.

Accordingly, the complaint should be dismissed in its entirety.

## STATEMENT

1. Virginia and the nation are currently facing a pandemic.[1] In the months since experts first identified the novel coronavirus now known as COVID-19, the disease has infected more than 67 million people worldwide and killed over 1.5 million—including more than 282 thousand in the United States alone.[2] Virginia's confirmed death toll stands at 4,208 with over 258,870 reported cases, while Prince William County (including Manassas City and Manassas Park) has seen 22,647cases and 271 deaths.[3]

2. Lacking a vaccine or cure, officials—in Virginia and elsewhere—have focused on slowing the virus's spread, primarily through a series of emergency executive actions.

a. On March 23, the Governor issued Executive Order 53 (EO 53).[4] Emphasizing that "person-to-person contact increases the risk of transmission and community spread," (p. 1), that order prohibited "gatherings of 10 or more," suspended "in-person instruction" in schools, and

---

[1] In reviewing a Rule 12(b)(6) motion, the Court may properly take judicial notice of matters of public record. *Philips v. Pitt Cty. Mem'l Hosp*., 572 F.3d 176, 180 (4th Cir. 2009).

[2] Johns Hopkins Coronavirus Resource Center, COVID-19 Dashboard (last visited December 7, 2020), https://coronavirus.jhu.edu/map.html

[3] Virginia Dep't of Health, COVID-19 Cases in Virginia (last visited December 7, 2020), https://www.vdh.virginia.gov/coronavirus/

[4] Second Amended Executive Order 53 is publically available at: https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-53-SECOND-AMENDED-Extension-of-Temporary-Restrictions-Due-To-Novel-Coronavirus-(COVID-19).pdf

closed "dining and congregation areas" in restaurants, ¶¶ 1–3. Most "brick and mortar retail business[es]" were limited to "10 patrons," with certain "[e]ssential" retail businesses not subject to the 10-patron limit. ¶¶ 5, 6. "[R]ecreational and entertainment businesses" were required to temporarily "clos[e] [] all public access." ¶ 4.

b. A week later, the Governor imposed additional restrictions in Executive Order 55 (EO 55. Ex. 1. EO 55 directed that "[a]ll individuals in Virginia shall remain at their place of residence, except as provided below by this Order and Executive Order 53." ¶ 1. Among other permissible activities, Virginians were expressly allowed to leave their homes to visit "place[s] of worship." *Id*. EO 55 also addressed the temporary gatherings restriction first announced in EO 53, reiterating that it applied to "[a]ll public and private in-person gatherings of more than ten individuals," and specifically stating that "[t]his includes parties, celebrations, religious, or other social events, whether they occur indoor or outdoor." ¶ 2 (emphasis added). EO 55 clarified, however, that "[t]his restriction does not apply" to "the gathering of family members living in the same residence." ¶¶ 2 & 2(b).

3. Though not without costs, the measures imposed proved effective at reducing COVID-19's spread. Given that success, the Governor implemented a multi-phase process for reopening the Commonwealth's businesses and permitting previously prohibited activities. See Third Amended Executive Order 61 and Order of Public Health Emergency Three (EO 61).[5]

a. Phase One of the Governor's reopening plan began with the imposition of Executive Order 61 on May 15, 2020. That order explained that, because Virginians' "efforts and sacrifices" had "slowed the spread of the virus," it was appropriate to "ease some of the restrictions" imposed in prior orders. EO 61, p. 2. Accordingly, EO 61 abrogated EO 55's stay-

---

[5] Third Amended Executive Order 61 is publically available at:
https://www.governor.virginia.gov/media/governorvirginiagov/governor-of-virginia/pdf/eo/Third-Amended-EO-61-Phase-I.pdf

4

at-home order and substantially loosened restrictions on numerous organizations and activities, including religious services. EO 61 also created a new exemption to the temporary gatherings restriction for in-person "religious services," provided that such services were "limited to no more than 50% of the lowest occupancy load on the certificate of occupancy of the room or facility in which the [] services are conducted," EO 61 ¶ (B)(2)(a)(i), and certain social distancing and hygiene requirements were followed, ¶ B(2)(a)(ii)–(x). Although "[i]ndividuals attending religious services must [generally] be at least six feet apart," this restriction was specifically inapplicable to "family members," who "may be seated together." ¶ (B)(2)(a)(ii).

b. Concerned that these measures would jeopardize efforts to contain COVID-19, officials in Northern Virginia asked the Governor to delay easing of restrictions in their communities. See Executive Order 62 and Order of Public Health Emergency Four (EO 62).[6] On May 12, the Governor granted that request in a new order jointly issued with the State Health Commissioner. EO 62, pp. 2, 6. Emphasizing that "the Northern Virginia Region face[d] unique challenges when compared to the rest of the Commonwealth"—including a "substantially higher . . . percentage of positive tests," far higher numbers of confirmed cases, and continued difficulties securing sufficient personal protective equipment—EO 62 declared that 13 specified localities (including Prince William County) would "remain in Phase Zero" for two additional weeks. EO 62, pp. 1–2, 5. Accordingly, the business-related provisions and stay-at-home order were reissued and the temporary gatherings restriction was again extended to include worship services. ¶¶ 1–4, 7. Like EO 61 (and EO 55), however, EO 62 specified that the temporary gatherings "restriction does not apply to the gathering of family members living in the same

---

[6] Amended Executive Order 62 is publically available at:
https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-62-and-Order-of-Public-Health-Emergency-Four-AMENDED.pdf

residence." ¶ 8. EO 62 automatically expired at "11:59 p.m. Thursday, May 28, 2020." EO 62, p. 6. Prince William County was then governed by EO 61.

c. On Tuesday, June 2, 2020, noting that the Commonwealth "has made remarkable progress over the past several weeks," the Governor announced that certain jurisdictions in Virginia would enter Phase Two on Friday, June 5, and would be governed by Executive Order 65 (EO 65). Under EO 65, restaurants could begin indoor dining service, subject to a 50% limitation on occupancy, a maximum of 50 patrons per party, and social distancing and hygiene requirements; fitness centers are permitted to open for indoor exercise, subject to a 30% occupancy limitation and a 50 person maximum for classes, as well as social distancing and hygiene requirements; public beaches are permitted to open, subject to restrictions, including a ban on groups of 50 or more; racetracks may open without spectators or other public participation; certain recreational and entertainment businesses may open, subject to a 50% occupancy limitation and a maximum of 50 people, as well as strict guidelines and social distancing and hygiene requirements; private and public social clubs may open, subject to the gatherings restriction; and recreational sports are allowed, subject, in most cases, to a 50% occupancy limitation (30% for indoor events) and a 50 person maximum, in addition to other restrictions. See ¶ (A)(2), (5), (9), (10), (11), (12), (13).[7]

EO 65 also modified the temporary gatherings restriction. Under EO 65, "[a]ll public and private in-person gatherings of more than 50 individuals were prohibited." EO 65 ¶ (B)(2). Like prior orders, EO 65 made clear that the restriction "does not apply to the gathering of family members living in the same residence" and also provided an exception for "religious services,"

---

[7] Amended Executive Order 65 is publically available at:
https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-65-and-Order-Of-Public-Health-Emergency-Six---AMENDED---Phase-Two-Easing-of-Certain-Temporary-Restrictions-Due-to-Novel-Coronavirus-(COVID-19).pdf

provided that such services do not exceed 50% of the occupancy load on the building in which they are held and other social distancing and hygiene requirements are followed. *Id.*

4.  On June 30, 2020, noting that public health metrics continued to show positive trends and that the percentage of positive tests continued to trend downward, the Governor issued Executive Order 67 implementing Phase Three effective July 1, 2020.[8] EO 67 substantially eased certain business restrictions and permitted gatherings of up to 250 persons. Portions of EO 67 were subsequently amended at various times to address, *inter alia*, differing COVID-19 rates in separate geographical areas; however, most of Virginia has remained in Phase Three since July 1, 2020.

5.  On November 13, 2020, noting that all five health regions in the Commonwealth were experiencing increases in new COVID-19 cases, positive tests, and hospitalizations, the Governor issued Sixth Amended Executive Order 67. Ex. 2.[9] All of Virginia now operates under Sixth Amended EO 67. Whereas all other gatherings are currently limited to 25 people or fewer, there is no limit to the number of participants who can attend a religious service. See Sixth Amended EO 67 at 11 ¶ B(1). Unlike non-religious gatherings, religious services of more than 25 people may still occur so long as the service complies with social distancing and certain hygiene requirements, including "[m]ark[ing] seating and common areas where attendees may congregate in six-foot increments" and using "disposable" items to "distribute food or beverages." *Id.*

---

[8] Executive Order 67 is publically available at:
https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-67-and-Order-of-Public-Health-Emergency-Seven---Phase-Three-Easing-of-Certain-Temporary-Restrictions-Due-to-Novel-Coronavirus-(COVID-19).pdf
[9] Sixth Amended Executive Order 67 is not currently set to expire at any particular time. Ex. 2 p. 15 ("This Order . . . shall remain in full force and effect until amended or rescinded by further executive order.").

6. In this case, Plaintiff alleges that EO 55 violates his First Amendment right to free exercise of religion (Compl. ¶ 30) and his right to assemble (*Id*. ¶ 42). Additionally, Plaintiff alleges a violation of his Fourth Amendment rights (*Id*. ¶ 53). In support of these claims, Plaintiff alleges "[he] was a practicing member in lay ministry at his Church in Gainesville Virginia until Defendant Northam's social distancing orders caused Tolle's Church to stop offering public services." *Id*. ¶ 5. As relevant here, Plaintiff requests "permanent injunctive relief which prevents the execution of the provisions of Defendants' orders under E0-55." *Id*. p. 23.

## LEGAL STANDARD

"Federal Rule of Civil Procedure 12(b)(1) permits a party to move to dismiss an action for lack of subject matter jurisdiction." *Allen v. College of William & Mary*, 245 F. Supp. 2d 777, 782 (E.D. Va. 2003). A Rule 12(b)(1) challenge "assert[s] that, as a factual matter, the plaintiff cannot meet the burden of establishing a jurisdictional basis for the suit." *Id*. (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). Once the issue of the court's subject matter jurisdiction is raised, "the plaintiff bears the burden of proof to preserve jurisdiction." *U.S. ex rel. Willoughby v. Collegiate Funding Servs., Inc*., No. 3:07-cv-290, 2010 U.S. Dist. LEXIS 139989, at *19 (E.D. Va. Sept. 21, 2010) (citing *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991))."[T]he evidentiary standard depends upon whether the challenge is a facial attack on the sufficiency of the pleadings, or an attack on the factual allegations that support jurisdiction." *Allen*, 245 F. Supp. 2d at 782-83 (internal quotation omitted).  As explained by the Fourth Circuit:

> When a defendant makes a facial challenge to subject matter jurisdiction, "the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration. In that situation, the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction. In the alternative, the defendant can contend—as the Government does here—that the jurisdictional allegations of the complaint [are] not true.

The plaintiff in this latter situation is afforded less procedural protection: If the defendant challenges the factual predicate of subject matter jurisdiction, "[a] trial court may then go beyond the allegations of the complaint and in an evidentiary hearing determine if there are facts to support the jurisdictional allegations, without converting the motion to a summary judgment proceeding. In that situation, the presumption of truthfulness normally accorded a complaint's allegations does not apply, and the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction.

*Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (internal quotes and citations omitted).

Pursuant to Rule 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss under Rule 12(b)(6), the Court "accept[s] as true all well-pleaded allegations and view[s] the complaint in the light most favorable to the plaintiff." *Philips v. Pitt County Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). But the complaint's factual allegations "must be enough to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court "'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Phillips*, 572 F.3d at 180 (quoting *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009)). The plaintiff must "provide the 'grounds' of his 'entitlement to relief'" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (internal citation omitted).

## ARGUMENT

Plaintiff's complaint should be dismissed in its entirety for four independent reasons. First, the Eleventh Amendment bars equitable relief against either of the Defendants on all of Plaintiff's claims. Second, Plaintiff cannot show his entitlement to injunctive or declaratory relief

against a gathering restriction which is no longer in force. Indeed, with respect to the expired restrictions, Plaintiff's claim fails as a matter of law because he cannot show any "real or immediate threat that [he] will be wronged again." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). And, Plaintiff does not allege any facts demonstrating harm from the restriction that remains in force today—Sixth Amended EO 67 does not prevent Plaintiff from engaging in the conduct he claims is prohibited. Accordingly, Plaintiff cannot demonstrate standing or meet the adversity requirement of Article III. Third, EO 55's now obsolete gathering restriction and the social distancing restrictions that remain in place represent good-faith, evidence-based emergency measures that warrant this Court's deference. Fourth, Plaintiff has failed to state a claim even under standards applicable to non-emergency measures.

## I.   Defendants Are Immune Pursuant to the Eleventh Amendment

### A.   The Eleventh Amendment bars suit against the Commonwealth

The Eleventh Amendment "render[s] States immune from being hauled into federal court by private parties." *Wright v. North Carolina*, 787 F.3d 256, 261 (4th Cir. 2015). The Supreme Court has squarely held that 42 U.S.C. § 1983 does not abrogate States' sovereign immunity and that a State is not a "person" within the meaning of that statute either. See *Will v. Michigan Dep't of State Polic*e, 491 U.S. 58, 66, 71 (1989). To the extent Plaintiff continues to seek relief against the Commonwealth itself, the Eleventh Amendment imposes an absolute bar.

### B.   The Eleventh Amendment bars Plaintiff's federal claims against the Governor

The Eleventh Amendment also precludes relief against the Governor. In general, state officers sued in their official capacities—as the Governor is here, see Compl. ¶ 6—are "entitled to Eleventh Amendment protection" because such a suit "'is not a suit against the officer but

rather is a suit against the officer's office.'" *Lytle v. Griffith*, 240 F.3d 404, 408 (4th Cir. 2001) (quoting *Will*, 491 U.S. at 71).

1. In *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court recognized a limited exception to the general rule of immunity that permits federal courts to grant prospective relief against a state officer when that officer acts in violation of federal law. As the Court explained, that doctrine is based on the "fiction" that an officer who acts unconstitutionally is "stripped of his official or representative character" and may therefore be "subject[]" to "the consequences of his individual conduct" in federal court. *Id*. at 159–60.

Although *Young* provides an avenue for plaintiffs seeking injunctive and declaratory relief against States, "[t]he purpose of allowing suit against state officials to enjoin their enforcement of an unconstitutional [law] is not aided by enjoining the actions of a state official not directly involved in enforcing the subject [law]." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 332 (4th Cir. 2001). Accordingly, the *Young* exception is limited to situations where a plaintiff can show: (1) a "special relation" between the officer sued and the challenged policy; and (2) that the officer has "acted or threatened" to enforce the policy. *McBurney v. Cuccinelli*, 616 F.3d 393, 399, 402 (4th Cir. 2010). These requirements ensure both that "the appropriate party is before the federal court, so as not to interfere with the lawful discretion of state officials" and that "a federal injunction will be effective with respect to the underlying claim." *South Carolina Wildlife Fed. v. Limehouse*, 549 F.3d 324, 333-34 (4th Cir. 2008).

2. The Fourth Circuit has repeatedly found that actions against a State's Governor fail to satisfy the *Young* prerequisites.

In *Gilmore*, for example, the Fourth Circuit dismissed Virginia's Governor from a case alleging constitutional infirmity with five statutes involving the transportation and disposal of

11

municipal solid waste. "[A]lthough Governor Gilmore [was] under a general duty to enforce the laws of Virginia by virtue of his position as the top official of the state's executive branch," the Court explained, "he lack[ed] a specific duty to enforce the challenged statutes." 252 F.3d at 331 (emphasis added). In *Allen v. Cooper*, 895 F.3d 337 (4th Cir. 2018), the Fourth Circuit likewise declined to apply the *Young* exception to a suit against the Governor of North Carolina, explaining that when a plaintiff sues "to enjoin the enforcement of an act alleged to be unconstitutional, the exception applies only where a party defendant in [such] a suit . . . has some connection with the enforcement of the Act." *Id*. at 355 (quotation marks omitted). Numerous other decisions from within this circuit have also rejected attempts to sue governors under *Ex Parte Young*. See, e.g., *Kobe v. Haley*, 666 Fed. Appx. 281, 300 (4th Cir. 2016); *Lighthouse Fellowship Church v. Northam*, 2020 WL 2614626, at \*4–\*5 (E.D. Va. May 21, 2020); *Virginia Uranium, Inc. v. McAuliffe*, 147 F. Supp. 3d 462, 467–68 (W.D. Va. 2015); *Harris v. McDonnell*, 988 F. Supp. 2d 603, 606 (W.D. Va. 2013); *North Carolina State Conference of NAACP v. Cooper*, 397 F. Supp. 3d 786, 800–02 (M.D.N.C. 2019).

3. These precedents preclude Plaintiff's claims against the Governor.

a. As in *Gilmore* and *Cooper*, the Governor's "[g]eneral authority to enforce the laws of the state is not sufficient to make [him a] proper part[y] to litigation challenging the law." *Gilmore*, 252 F.3d at 331 (emphasis added; citation omitted). Nor does any specific statute or order confer the necessary enforcement authority. Virginia's Emergency Law authorizes the Governor to "issue" executive orders in the event of an emergency, but nowhere does it authorize him—personally—to enforce them. Va. Code Ann. § 44-146.17(1). The emergency-related orders themselves also do not authorize personal enforcement by the Governor, either expressly or by implication. To the contrary, EO 55 made violation of its gatherings restriction punishable

as a misdemeanor offense, (see Ex. 1, EO 55 p. 2), the prosecution of which is committed to the discretion of local Commonwealth's Attorneys, who are separate constitutional officers under Virginia law. See Va. Code Ann. § 15.2-1627(B) (granting Commonwealth's Attorneys "discretion [t]o prosecute Class 1 . . . misdemeanors"); accord *McBurney*, 616 F.3d at 399. For that reason, the Governor has no "special relation" to enforcement of the challenged restrictions.

b. As in *McBurney*, the second *Young* requirement is also lacking here because Plaintiff has failed to allege—much less demonstrate—that the Governor "has . . . acted or threatened to act" to enforce the challenged restrictions against anyone, let alone against Plaintiff. 616 F.3d at 402. The Fourth Circuit has been clear that *Young* involves two discrete inquiries: whether the officer sued has a "special relation" to the challenged law, and whether he has "acted or threatened" to enforce that law. *McBurney*, 616 F.3d at 401–02. The mere existence of a criminal prohibition cannot establish the intent to enforce that prohibition against Plaintiff whether it is found in an executive order or in a statute. Moreover, the Governor's support for a particular policy—evidenced here by his decision to impose the emergency-related restrictions—is insufficient to meet either of the *Young* prerequisites. As the Fourth Circuit has expressly held, "[t]he fact that [the Governor] has publicly endorsed and defended the challenged [policy]" does not render him a proper defendant for Young purposes. See *Gilmore*, 252 F.3d at 331.

In *In re Abbott*, 956 F.3d 696, 708–09 (5th Cir. 2020), for example, the Fifth Circuit concluded that Texas's Governor was not a proper defendant in a suit challenging a COVID-19 related executive order because public health officials and local law enforcement were responsible for addressing violations of the challenged order. As the Fifth Circuit explained, "[t]he power to promulgate law is not the power to enforce it" and without the latter, the *Young* exception does not apply. *Id*. at 709.

13

Citing *Abbott*, another judge in this district recently rejected application of the *Young* exception to Governor Northam in relation to the Covid-19 executive orders. In *Lighthouse Fellowship Church v. Northam*, 462 F. Supp. 3d 635 (E.D. Va. 2020), a church challenged Virginia's previous temporary gatherings restriction. In denying the church's request for a preliminary injunction the court recognized that Virginia's Emergency Law, Va. Code §44-147.17, "does not provide the Governor with any special authority to enforce the executive orders that he issues in response to an emergency. Instead, the statute allows the Governor to create law in an emergency. The power to promulgate law is not the power to enforce it. The Ex parte Young exception turns on who has the prospective authority to enforce the law, not on who had retrospective authority to create the law." *Lighthouse*, at 643, citing *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020).

## II.   Plaintiff is Not Entitled to Equitable Relief Against any of the Executive Orders

Even if the Eleventh Amendment did not independently bar all of his claims, Plaintiff would remain unable to show he is entitled to the relief he seeks.

Plaintiff complains that EO 55's temporary 10 person gathering restriction "prohibits the free exercise of religion." Compl. ¶ 30. But this claim is moot as the restriction is no longer in effect. As to those restrictions that have expired, Plaintiff's claim fails as a matter of law because he cannot show any likelihood that the alleged harm will recur. Plaintiff also complains that EO 55's 6 foot distancing requirement deprives him of his right to assemble. *Id*. ¶ 42. With respect to this restriction (which remains in effect under Sixth Amended EO 67), Plaintiff asserts no injury and there is no real adversity because that measure does not prevent Plaintiff from engaging in activity he impliedly identifies–personal attendance at church services.

### A.     Plaintiff's challenge to the now-expired provisions fails as a matter of law

As his Complaint confirms, Plaintiff challenges Executive Order 55, which was issued by the Governor on March 30, 2020. See Compl., *generally*. But the text of that executive order shows that it expired in its entirety no later than June 10, and many of its provisions—including the stay-at-home order—were abrogated before then.[10] Since July 1, 2020, most of Virginia has been in Phase Three of the Governor's reopening plan, which does not include a stay-at-home order, currently permits in-person gatherings of up to 25 people, and permits in-person religious services of any size.

The purpose of an injunction is to prevent future violations," *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). The Supreme Court has specifically "declin[ed] . . . to slight the preconditions for equitable relief" in constitutional cases, emphasizing that "the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the [S]tates' . . . laws." *Lyons*, 461 U.S. at 112; see *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 299 (1943) (noting that requests for declaratory relief are subject to equitable limitations). For that reason, even where a plaintiff succeeds in establishing Article III standing to seek an injunction, "[t]he equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged" in the future. *Lyons*, 461 U.S. at 111. To obtain an injunction against future actions, therefore, Plaintiff must establish "some cognizable danger" of future harm. *W. T. Grant Co.,* 345 U.S.at 633.

---

[10] See, e.g., Executive Order Number Sixty-One and Order of Public Health Emergency Three, Phase One Easing of Certain Temporary Restrictions Due to Novel Coronavirus (COVID-19) (issued May 8, 2020; effective May 15, 2020), https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-61-and-Order-of-Public-Health-Emergency-Three---Phase-One-Easing-Of-Certain-Temporary-Restrictions-Due-To-Novel-Coronavirus-(COVID-19).pdf

Plaintiff makes no such showing against restrictions from EO 55. To be sure, should Virginia experience a spike in COVID-19 cases, the Governor and other public health officials might consider what, if any, further social distancing measures are necessary to save lives and preserve the public health. But the hypothetical possibility that defendants may impose some type of restrictions in the future is insufficient to warrant the exercise of this Court's equitable powers based on restrictions imposed in the past. Because Plaintiff does not allege any "cognizable danger" of future harm, *W.T. Grant*, 345 U.S. at 633, this Court should dismiss his requests for equitable relief against restrictions that are no longer in force. See also *Tigges v. Northam*, No. 3:20-CV-410, 2020 WL 4197610, at *6 (E.D. Va. July 21, 2020) (holding that "any challenge to an expired Executive Order or Order of Public Health Emergency is moot," even if officials might "reinstate restrictions" in the future); *Spell v. Edwards*, 962 F.3d 175, 179–80 (5th Cir. 2020) (similar challenge to COVID-related orders became "moot" when the "orders expired by their own terms").

### B.    Plaintiff otherwise lacks standing to challenge the current six foot social distancing measures

The "'irreducible constitutional minimum' of standing consists of three elements[:] The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). As "[t]he party invoking federal jurisdiction," plaintiffs "bear[] the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

Here, Plaintiff seeks relief from the temporary gatherings restriction imposed under EO 55 because, in his view, that restriction "prohibits the free exercise of religion by United States citizens in Virginia by prohibiting all public and private in-person gatherings of more than ten

16

individuals." Compl. ¶ 30. Plaintiff also avers that EO 55's gathering restriction and 6 foot distancing requirement abridge "the rights of citizens in Virginia to gather and come within 6 feet of each other under the United States Constitution disproportionately deprive healthy people of their rights and are an unreasonable restriction on the right of citizens to assemble. . ." Compl. ¶¶ 42, 44. But the complaint fails to allege any concrete harm resulting from those restrictions. The only allegation particularized to Plaintiff is that Plaintiff "was a practicing member in lay ministry at his Church in Gainesville Virginia until Defendant Northam's social distancing orders caused Tolle's Church to stop offering public services." Compl. ¶ 5. Nor has Plaintiff alleged any facts to show public health officials threatened to enforce any such requirements or relied on EO 55 (or Sixth Amended EO 67—the only currently operative order)—in taking action against Plaintiff or his church. And, nothing in Sixth Amended EO 67 prevents churches from offering public services. Sixth Amended EO 67 places no limit on the size of church gatherings and Plaintiff does not allege how the 6 foot distancing requirement affects his exercise of religion or right to assemble.[11]

Plaintiff therefore lacks standing to challenge either restriction, and also fails to present the kind of "real, earnest, and vital controversy" required for Article III jurisdiction. *Valley Forge Christian College v. Americans United for the Separation of Church & State*, 454 U.S. 464, 471 (1982) (quotation marks and citation omitted).

---

[11] Although not averred in his Complaint, Plaintiff asserts in recent filings that "the restrictions in paragraph B.1.c of the latest Order are so invasive to the free practice of religion that Petitioner, who is a Catholic, cannot receive Holy Communion without violating these rules and being subject to criminal penalties." (ECF No. 40, PageID# 243). But nothing in Sixth Amended EO 67 precludes this activity. EO 67 allows for communion and specifically references "distribu[ting] food or beverage[s]," EO 67 ¶ (B)(1)(c). This construction of EO 67 is the official interpretation of the Commonwealth and should be treated as such. See, e.g., *Washington Legal Foundation v. Henney*, 202 F.3d 331, 336 (D.C. Cir. 2000) (declining to reach "hypothetical" question of statute's constitutionality where no enforcement was claimed and "the government . . . announced [in litigation] nothing less than an official interpretation" that did not implicate the plaintiffs' constitutional challenge).

**III.    The Temporary Gatherings Restriction Represents A Good-Faith, Evidence-Based Emergency Measure That Warrants This Court's Deference**

Courts have long recognized that the elected branches of government must have the ability to take decisive and targeted action to address matters of urgent concern during emergencies. As the Fourth Circuit has explained, "[d]ealing with . . . an emergency situation requires an immediacy of action that is not possible for judges." *United States v. Chalk*, 441 F.2d 1277, 1281 (4th Cir. 1971). For that reason, in evaluating measures taken during a state of emergency, "the scope of [a court's] review . . . must be limited to a determination of whether the [executive's] actions were taken in good faith and whether there is some factual basis for [the Governor's] decision that the restrictions he imposed were necessary to maintain order." *Id.*; accord *Smith v. Avino*, 91 F.3d 105, 109 (11th Cir. 1996). That framework reflects the reality that "governing authorities must be granted the proper deference and wide latitude necessary for dealing with . . . emergenc[ies]." *Smith*, 91 F.3d at 109.

As Chief Justice Roberts recently explained in rejecting a free-exercise challenge to California's COVID-related restrictions, "the politically accountable officials of the States" are entrusted with "latitude [that] must be especially broad" to protect "the safety and the health of the people." *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring) (citing *Jacobson*, 197 U.S. at 38). "Where those broad limits are not exceeded," the Chief Justice explained, "they should not be subject to second-guessing" by the judicial branch, "which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *South Bay*, 140 S. Ct. at 1613–14. Here, the Executive Orders fit comfortably within the type of "emergency measures" necessary to protect "the health, safety and welfare of the people of this Commonwealth" and should be upheld for that reason alone. *Boyd v. Commonwealth*, 216 Va. 16, 19-20 (1975).

The current situation presents a particularly appropriate moment for such limitation of the Court's review. Plaintiff makes no allegation that the Executive Orders were issued in bad faith and there is no serious argument that the Governor has acted without "some factual basis." *Chalk*, 441 F.2d at 1281; *South Bay*, 140 S. Ct. at 1613 (noting that "COVID-19 [is] a novel severe acute respiratory illness" for which "there is no known cure, no effective treatment, and no vaccine"). Accordingly, the Governor's chosen strategy for slowing the spread of COVID-19 and saving lives warrants this Court's deference. Accord *id.* at 11–15 (so holding). As a matter of law, applying the necessary deferential standard, Plaintiff has failed to state a claim for a violation of any constitutional or federal right.

## IV.  Plaintiff has Failed to State a Claim Even Under the Standards Applicable to Non-Emergency Measures

### A.  Plaintiff Fails to Assert a Plausible First Amendment Free Exercise Claim

Plaintiff alleges of a violation of his right to free exercise of religion, (see "First Cause of Action," Compl., p. 7). The sole fact alleged in support of this claim is that the "distancing orders caused Tolle's Church to stop offering public services." Compl. ¶ 5. Plaintiff does not further elaborate on how his ability to exercise his religion is impacted, however. And, even if Plaintiff did so explain, his claim fails even under the familiar standards of judicial review that apply outside an emergency setting. The Free Exercise Clause, made applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law ... prohibiting the free exercise" of religion. U.S. Const. amend. I.  "[T]he free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Yacovelli v. Moeser*, 324 F. Supp. 2d 760, 763 (M.D.N.C. 2004), citing *Employment Div., Dept. of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990). Nevertheless, "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general

applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Smith*, 494 U.S. at 879 (internal quotation marks and citation omitted) (collecting cases).

By contrast, "the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct *because* it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) (emphasis added). Indeed, "a neutral law of general applicability, however, does not offend the Free Exercise Clause, despite any incidental religious burdens it creates." *Amer. Life League, Inc. v. Reno*, 47 F.3d 642, 654 (4th Cir. 1995). Here, Plaintiff makes no argument that the current social distancing requirements (or the former ban on gatherings of 10 or more) were implemented "because" they are "undertaken for religious reasons," *Church of Lukumi*, at 532; to the contrary, the executive orders on their face identify fighting the spread of the novel coronavirus COVID-19 as motivation, there can be no argument that this motivation is pre-textual, and the law is not restricted to religious gatherings, instead applying to all gatherings.

"Under the Supreme Court's free exercise doctrine, a neutral government decision of general applicability is subject to rational basis review, even where it has the incidental effect of burdening religious exercise." *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cty., Maryland*, 915 F.3d 256, 265 (4th Cir. 2019), as amended (Feb. 25, 2019). "To pass muster under rational basis review, legislation need only be rationally related to a legitimate government interest." *Capital Associated Indus., Inc. v. Stein*, 922 F.3d 198, 210 (4th Cir. 2019) (quotation marks and citation omitted). In this case, the government has a more than legitimate interest in preventing the spread of a deadly disease to which there is currently no cure. And all available

science—including the advice of health officials cited *within the executive orders*—supports the commonsense proposition that minimizing gatherings and social-distancing helps prevent the spread of an airborne respiratory disease that has been shown to spread in crowds.

In *Lighthouse Fellowship Church v. Northam*, 2020 WL 2110416, at \*4–8 (E.D. Va. May 1, 2020), the United States District Court for the Eastern District of Virginia thoroughly examined and correctly rejected the claim that the Governor's Executive Orders had singled out religious activity for unfavorable treatment as compared to similarly situated secular activities. "The Governor's Orders are facially neutral," the court explained, because "[t]hey do not refer to a religious practice to single it out for discriminatory treatment." *Id.* at \*5. To the contrary, the temporary gatherings restriction applied to "*[a]ll* public and private in-person gatherings of more than ten individuals," (EO 55, p. 2, emphasis added), both "secular and religious" alike, *Lighthouse*, 2020 WL 2110416, at \*5. In an effort to "slow[] the spread of a deadly pandemic and sav[e] lives," the Governor deemed it necessary to "clos[e] temporarily all places where more than ten people might gather, subject to certain exceptions that [were] themselves designed carefully to preserve life health, and livelihood." *Id.* at \*8. In doing so, the Governor acted in a way that was "neutral and generally applicable" and "d[id] not target religious establishments." *Id.*

And more recently, another court in this District arrived at the same conclusion in granting a motion to dismiss. In *Bareford v. Northam*, No. 4:20-cv-00050-AWA-LRL (E.D. Va. Nov. 25, 2020), the court ruled that a plaintiff's First Amendment challenge to EO 55 could not survive under Rule 12(b)(6). In that case, the plaintiff specifically alleged that "paragraph 2 of Executive Order 55 has impacted his ability to attend not only religious functions, but political, educational, and social functions that involve more than ten individuals." *Bareford*, Dismissal

Order, at ECF No. 11 PageID# 172. Noting that paragraph 2 of EO 55 provides that it applies to "[a]ll public and private in-person gatherings of more than ten individuals," the court found that "plaintiff has not alleged any facts from which it could be inferred that paragraph 2 of Executive Order 55 is religiously motivated or has been selectively applied in a manner that violates Plaintiff's rights." *Id.*

The foregoing reasoning also withstands scrutiny under the Supreme Court's recent decision in *Roman Catholic Diocese of Brooklyn v. Cuomo*, ___ U.S ___, No. 20A87, 2020 WL 6948354 (U.S. Nov. 25, 2020) which addressed a First Amendment challenge to an executive order issued by the Governor of New York. In *Roman Catholic Diocese of Brooklyn* the court ruled that a preliminary injunction was appropriate because the plaintiffs made a "strong showing that the challenged restrictions violate 'the minimum requirement of neutrality' to religion." *Id.*, at *1, citing *Church of Lukumi,* at 533. But the court relied on two factors inapposite to this matter to arrive at its conclusion. First, the court noted that, "statements made in connection with the challenged rules can be viewed as targeting the ultra-Orthodox [Jewish] community." *Roman Catholic Diocese of Brooklyn*, at *1. Second, the court noted that, "even if those comments could be put aside, the regulations cannot be viewed as neutral because they single out houses of worship for especially harsh treatment." *Id*. Indeed, the executive order at issue in *Roman Catholic Diocese of Brooklyn* explicitly singled out houses of worship for harsher gathering size limitations.[12] Here, unlike the New York order, EO 55 applied to all gatherings and did not single out religious gatherings for harsher treatment.

Moreover, former EO 55 and current Sixth Amended EO 67 do not prohibit Plaintiff from observing any religious obligation. And both the current social distancing requirements and

---

[12] See New York executive order 20-268 is publically available at https://www.governor.ny.gov/news/no-20268-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency

the former (now obsolete) in-person gathering limit of more than ten people who were not family members are precisely the sort of neutral rules of general applicability that comfortably survive rational-basis review under well-established free exercise doctrine. Because the temporary gatherings restriction is subject to rational-basis review, the Governor need not show it is the "least restrictive means" of furthering the government's interest in protecting human life. See *Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548, 557 (4th Cir. 2013) (noting that "the least restrictive means" test applies to government actions subject to "strict scrutiny").

Finally, even if EO 55 or Sixth Amended EO 67 were subject to a heightened level of review they would survive strict scrutiny. A government decision fails strict scrutiny only if it is not narrowly tailored to advance a compelling state interest. *Jesus Christ Is the Answer Ministries, Inc.,* at 265 (quoting *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 546). As outlined above, immediate intervention designed to stem a global pandemic reaching and growing within the Commonwealth is a compelling state interest. See *Workman v. Mingo Cty. Bd. of Educ.*, 419 F. App'x 348, 353 (4th Cir. 2011) ("the state's wish to prevent the spread of communicable diseases clearly constitutes a compelling interest."). For example, the Fourth Circuit has determined that mandatory vaccination laws survive strict scrutiny. See *id*, at 353-354 (West Virginia's law requiring vaccinations before a child attends public school survives strict scrutiny ("assuming for the sake of argument that strict scrutiny applied") and does not unconstitutionally infringe plaintiff's right to free exercise). Here, for example, the current social distancing requirement is narrowly tailored to advance this interest. Specifically, the social

distancing requirements comport with relevant publically available CDC guidelines to slow the spread of COVID-19.[13]

B.     Plaintiff Has Failed to State of Claim for a Violation of the Right to Assemble

Plaintiff claims a violation of his "freedom to assemble." See "Second Cause of Action," Compl., p. 11. Like other First Amendment freedoms, the right to peaceably assemble is not absolute. See American *Communications Ass'n v. Douds*, 339 U.S. at 399, also see *Rockwell v. Town of Hamden*, 800 F. App'x 54 (2d Cir. 2020). While the Court should apply the deferential standard applicable to the emergency at hand and find no constitutional violation as a matter of law, EO 55 would have survived more exacting scrutiny. Absent an emergency, "[t]he Government is permitted to restrict the time, place, and manner of assemblies so long as those restrictions further a significant governmental interest[ ], and permit alternative channels for the communication of the information." *Rockwell*, at 54 (2d Cir. 2020), internal quotations and citations omitted, also see *Ross v. Early*, 746 F.3d 546, 552 (4th Cir. 2014) (time, place, and manner doctrine determines whether restrictions placed on protected speech violate the First Amendment).

Content- or viewpoint-based restrictions on expressive activity receive strict scrutiny and the Government's regulation must be narrowly tailored to achieve a compelling governmental interest. *Kessler v. City of Charlottesville*, 2020 U.S. Dist. LEXIS 31420, *30 (W.D. Va. 2020) (citing *Brown v. Entin't Merchs. Ass'n*, 564 U.S. 786, 799 (2011)). "But restrictions that are content- or viewpoint-neutral, yet still incidentally restrict speech, receive intermediate scrutiny." *Id.* (citing *Turner Broadcasting Sys., Inc. v. Fed. Commc'ns. Comm'n*, 512 U.S. 622, 642 (1994)). "Under intermediate scrutiny, the Court must examine whether the restriction furthers

---

[13] See https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html

an important or substantial governmental interest that is unrelated to the suppression of free expression and no more extensive than necessary in order to serve that governmental interest." *Id.* (internal citations omitted). See also *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (stating content and viewpoint neutral restrictions on speech must be narrowly tailored to "leave open ample alternative channels for communication").

Here, former (now obsolete) EO 55 and current Sixth Amended EO 67 are content neutral. EO 55 prohibited any gathering in excess of 10 people and EO 67 requires 6 foot distancing, irrespective of the content of the event. Thus, intermediate scrutiny should be employed to determine 1) if the restrictions further an important or substantial governmental interest and 2) if the restrictions are no more extensive than necessary to serve the governmental interest.

First, former EO 55 and current Sixth Amended EO 67 clearly serve a substantial governmental interest – protecting the health, safety, and welfare of Virginians. See *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 485 (1995) (holding "the Government here has a significant interest in protecting the health, safety, and welfare of its citizens . . ."). The Fourth Circuit has held that "the state's wish to prevent the spread of communicable diseases clearly constitutes a compelling interest." *Workman*, 419 F. App'x 348, at 353.

Second, EO 55 was narrowly tailored to serve the government's significant interest of protecting the health, safety and welfare of Virginians. EO 55, on its face, comported with relevant CDC guidelines to slow the spread of COVID-19 while the number of Virginians infected with COVID-19 continued to climb. Preventing large groups from congregating is tailored to decreasing the risks of community spread.  In addition, EO 55 was not a permanent ban but expired on June 10, 2020, (religious gatherings were permitted in Northern Virginia as of

May 28, 2020 pursuant to EO 62). Thus, EO 55's restrictions were no more restrictive than necessary to serve the Commonwealth's goal of slowing the spread of COVID-19.

Third, EO 55 allowed for alternate channels of communication and opportunities of expression. "[The First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired.'" *Students against Apartheid Coalition, v. O'Neil*, 671 F. Supp. 1105, 1107 (W.D. Va. 1987) (internal citations omitted). Under EO 55, gathering with others in small groups, holding drive-in/parking lot services, and/or holding multiple smaller gatherings during the week, were all permitted, for example. In addition, EO 55 did not restrict any live communications by telephone or gatherings via the internet. There are myriad things that Plaintiff could have done to exercise his freedom to peaceably assemble that did not violate EO 55.

In summary, now-expired EO 55 contained reasonable time, manner, and place restrictions that comported with the First Amendment. And current Sixth Amended EO 67 does not preclude religious gatherings of any size. For these reasons, Plaintiff has also failed to state a claim for a violation of his right to peaceably assemble.

## V.  Plaintiff Fails to State a Claim for a Violation of the Fourth Amendment

Plaintiff claims violations of his Fourth and Fourteenth Amendment Rights. See "Third Cause of Action" and "Fourth Cause of Action," Compl. pp. 15-18. However, these claims merely recite legal conclusions. "Legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well pled facts for Rule 12(b)(6) purposes." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

Under the standard established by *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009), compliance with Rule 8(a)(2) of the Federal Rules of Civil Procedure requires more than "labels and conclusions," and a complaint must "state a claim to relief that is plausible on its face." *Id*. Therefore, even under standards applicable during non-emergencies, Plaintiff has failed to state a claim and his Complaint should be dismissed pursuant to Rule 12(b)(6).

**CONCLUSION**

For the reasons stated above, Defendants respectfully request that this Court grant their motion and dismiss Plaintiff's claims against them in their entirety.

Respectfully Submitted,

COMMONWEALTH OF VIRGINIA
GOVERNOR RALPH S. NORTHAM,


By:____/s/ Calvin C. Brown_____
Calvin C. Brown (VSB No. 93192)
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-4933
cbrown@oag.state.va.us
*Counsel for Commonwealth Defendants*


Mark R. Herring
Attorney General of Virginia

Samuel T. Towell
Deputy Attorney General

Marshall H. Ross
Senior Assistant Attorney General/Trial Section Chief

CERTIFICATE OF SERVICE

I hereby certify that, on this 8th day of December, 2020, the foregoing was electronically

filed and mailed via U.S. Mail to the following:

James Tolle
Pro Se
11171 Soldiers Court
Manassas, VA 20109

/s/ Calvin C. Brown
Calvin C. Brown (VSB No. 93192)
Assistant Attorney General
Office of the Attorney General of Virginia
Barbara Johns Building
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-4933
Facsimile:  (804) 371-2087
Email: cbrown@oag.state.va.us
*Counsel for Defendants*