

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

—————————————————————————————

JAMES TOLLE,                                                    Civil Action No. 1:20-cv-00363

                        Plaintiff,

    v.

GOVERNOR RALPH NORTHAM and the COMMONWEALTH OF VIRGINIA

                  Defendants.

—————————————————————————————

## MOTION FOR PRELIMINARY RELIEF

Plaintiff continues to suffer serious injury from Defendant Northam's emergency orders while the Court considers Plaintiff's Complaint (Dkt. 1) and Defendants' Motion to Dismiss and Defendants' Memorandum of Law in Support of Defendants'Motion to Dismiss (Dkts. 46, 47). The District Court's Order of April 8, 2020 (Dkt. 9), denied Plaintiff's original request for preliminary relief or a preliminary-injunction hearing.  Plaintiff's appeal of this as an interlocutory order was denied by the Circuit Court of Appeals for the Fourth Circuit, finding that the appeals court did not have jurisdiction because the District Court's order involved a Temporary Restraining Order only and the appeals court issued its mandate on November 17, 2020, following the ruling of October 26, 2020 (Dkts. 38, 39 and 44).

Since Plaintiff's original request for preliminary relief, the U. S. Supreme Court has provided guidance to lower courts in favor of preliminary relief where Executive Orders in several states are abridging constitutional rights[1]  Plaintiff now moves for the Court to consider

———————————————

[1] *The Roman Catholic Diocese of Brooklyn, New York v. Andrew M. Cuomo*, 592 U. S. ____ (2020) ("The applicants have clearly established their entitlement to relief pending appellate review").  See also *High Plains Harvest Church, et al.,v. Polis, et al.* 592 U.S. ___ (2020) ("Tenth Circuit...to remand to the District Court for...consideration in light of...*Diocese of Brooklyn  v. Cuomo....*"), *Harvest Rock Churck, Inc., et al. v. Newsom*, No. 20A94, 592 U.S. ___ (Dec. 3, 2020)

granting immediate preliminary relief in light of *The Roman Catholic Diocese of Brooklyn, New York v. Andrew M. Cuomo*, 592 U. S. ____ (2020) (hereinafter, *"Diocese of Brooklyn"*) in order to prevent further injury of Plaintiff's constitutional rights from Defendant Northam's orders. Following the guidance in *Diocese of Brooklyn,* Plaintiff believes that the request in the present motion satisfies all of the criteria for preliminary relief because Plaintiff's "claims are likely to prevail, that denying them relief would lead to irreparable injury, and that granting relief would not harm the public interest." *Diocese of Brooklyn,* p. 2, referencing *Winter v. Natural Resources Defense Council, Inc.,* 555 U. S. 7, 20 (2008) (hereinafter, *"Winter"*).    Justification for this is explained in the following arguments.

### ARGUMENTS FOR PRELIMINARY RELIEF

1.      Plaintiff is seeking urgent relief from Defendant Northam's orders which have caused serious injury to Plaintiff's rights under the First, Fourth and Fourteenth Amendments since the original emergency orders in March, 2020, and will continue to cause injury to Plaintiff without action by the Court.   Preliminary relief is justified in this case because Plaintiff's Complaint is not moot and because a preliminary injunction in Plaintiff's case satisfies the criteria for preliminary relief according to the Supreme Court guidance in *Diocese of Brooklyn* and *Winter.*

### Plaintiff's Complaint is not Moot

2.      Plaintiff's Complaint is not moot because it involves ongoing restrictions on Plaintiff's First Amendment rights to free speech and free practice of religion which do not satisfy strict scrutiny's compelling interest or narrow tailoring, because the current orders infringe Plaintiff's Fourth Amendment rights without probable cause, and because they fail to

2

provide Plaintiff due process and equal protection under law according to Virginia law and the Fourteenth Amendment.  However, even if Defendant Northam changes his current orders to end the injury to Plaintiff's rights, Plaintiff's Complaint is still not moot as noted in *Diocese of Brooklyn*, p. 6  for similar emergency orders ("It is clear that this matter is not moot. See *Federal Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U. S. 449, 462 (2007); *Friends of the Earth, Inc. v. Laidlaw Envi-ronmental Services (TOC), Inc.*, 528 U. S. 167, 189 (2000).  And injunctive relief is still called for because the appli-cants *[sic.]* remain under a constant threat that the area in ques-tion will be reclassified as red or orange. See, e.g., *Susan B. Anthony List v. Driehaus*, 573 U. S. 149, 158 (2014)", *Diocese of Brooklyn*, p. 6)."  Furthermore, the ongoing vaccination programs do not moot Plaintiff's Complaint because it will take some time for sufficient progress in vaccinations to achieve herd immunity and it remains to be seen how effective the vaccines will be for the current or new strains of the virus.

## Request for Preliminary Injunction

3.     Plaintiff respectfully requests the Court grant a preliminary injunction which enjoins Defendant Northam's Executive Orders from abridging Plaintiff's rights under the First Amendment according to *Diocese of Brooklyn* and Plaintiff's rights under the Fourth and Fourteenth Amendments.  Similar to the complaints in *Diocese of Brooklyn*, Plaintiff's request for preliminary relief should be granted because Plaintiff's "claims are likely to prevail, that denying them relief would lead to irreparable injury, and that granting relief would not harm the public interest. See *Winter v. Natural Resources Defense Council, Inc.*, 555 U. S. 7, 20 (2008)." (*Diocese of Brooklyn*, p. 2)

3

*Reasons why Plaintiff's Complaint is likely to Succeed on the Merits on First Amendment Grounds*

4.    Defendant Northam' latest orders continue to treat religious activities differently than similar non-religious activities without a compelling interest or narrow tailoring. The Supreme Court has already found that COVID-19 related orders which apply stricter requirements to religious activities than the restrictions on similar other activities require a Strict Scrutiny review before they can be found Constitutional. In *Diocese of Brooklyn*, the per curiam opinion found no general applicability or neutrality when "a large store in Brooklyn that could literally have hundreds of people shopping there on any given day" was open while "a nearby church or synagogue would be prohibited from al-lowing *[sic.]* more than 10 or 25 people inside for a worship ser-vice. *[sic.]*" (*Diocese of Brooklyn*, p. 3, quotations removed). In Defendants' Motion to Dismiss, they argue that the *Diocese of Brooklyn* decision "relied on…'statements made in connection with the challenged rules can be viewed as targeting'" (Dkt. 39, p. 22), mistakenly arguing that the Supreme Court used that as the trigger for Strict Scrutiny. This is rebutted by the Supreme Court's opinion: "even if we put those comments aside, the regulations cannot be viewed as neutral because they single out houses of worship for es-pecially harsh treatment." (*Diocese of Brooklyn*, pp. 2-3). A fair reading of the Supreme Court's opinion shows that Strict Scrutiny was triggered after noting the disparity between how "the large store" was treated compared to the religious centers.

5.    Furthermore, there is no evidence from the Supreme Court's opinion in *Diocese of Brooklyn* that size restrictions alone trigger the Strict Scrutiny. Justice Gorsuch emphasized: "At a minimum, that [First] Amendment prohibits government officials from treating religious exer-cises *[sic.]* worse than comparable secular activities, unless they are pursuing a compelling interest and using the least re-strictive *[sic.]* means available." (Justice Gorsuch concurring, *Diocese of Brooklyn*, p. 1) This should make it clear to the Court that all disparate treatment is

subject to triggering Strict Scrutiny and it is not simply a matter of size limits.

6.      Defendant Northam's latest Order (see Dkt. 49, Exhibit G) does treat religious services more harshly than other similar activities.  Specifically, the same behaviors within a Church (gathering indoors, sitting together, interacting with a leader, singing, etc.) can be typical behaviors within classes at an institute of higher education.  However, Defendant Northam's Order places criminal penalties on violators of the restrictions in Church while exempting similar violators who are in classrooms.[2]  Defendant Northam's current orders state that "Individuals attending religious services must wear face coverings" (Dkt. 49, Exhibit G, Section B.1.b.vii) whereas attendees of Institutions of Higher Education are not explicitly required to do so (Dkt. 49, Exhibit G, Section B.2). Plaintiff believes that the disparate treatment of religious services that is still found in Defendant Northam's orders should subject the orders to Strict Scrutiny under the *Diocese of Brooklyn* ruling, *supra*.  Furthermore, Plaintiff believes that Defendants' argument that Defendant Northam's orders would "survive strict scrutiny" (Dkt. 39, p. 23) are flawed based on the disparate treatment that is still ongoing in Virginia.  It is impossible to argue that Defendant Northam's orders are "narrowly tailored" as Defendants do (Dkt. 39, p. 23) if other similar activities are not regulated as strictly.  By exempting similar activities at Institutions of Higher Education from some restrictions and harsh criminal penalties that apply to the same activities which are conducted at religious houses, Defendant Northam's restrictions on religious services are patently not as tailored as the restrictions on those other activities and therefore should fail any Strict Scrutiny review.

7.      Although Defendant Northam's Order uses language which is content neutral, the enforcement of Defendant Northam's orders has effectively made the Executive Order a

---

2 "Violations of section II, subsection B, paragraphs 1 and 3 of this Order shall be a Class 1 misdemeanor…." applies criminal penalties to violations of Church restrictions in Section B.1.b while exempting violators at Institutions of Higher Learning in section B.2. (Dkt. 49, Exhibit G, p. 14)

regulation which favors certain type of First Amendment expression over others. Plaintiff's Complaint included factual allegations related to this arbitrary application of Defendant Northam's Order "based on actions by Defendant Northam which favor his political party while restricting the political activities of his opponents" (Dkt. 1, ¶ 45). The Supreme Court has recognized in First Amendment cases that selective application of content neutral regulations can lead to unconstitutional stifling of free speech: "'a time, place, and manner regulation [must] contain adequate standards to guide the official's decision and render it subject to effective judicial review'....'[w]here the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content.'"[3] To the extent that the enforcement of Defendant Northam's orders effectively waive the requirements for some citizens and not for others, the Supreme Court has said "Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional...." (*Thomas,* at 325)

8.    Not only has Plaintiff's Complaint provided factual allegations showing Defendants' selective enforcement of Defendant Northam's orders prohibiting the freedom of political opponents to assemble, but actions of authorities since then have demonstrated how Defendant Northam's orders are selectively being enforced.[4] Due to the selective enforcement

---

3 *Occupy Columbia v. Haley,* 738 F.3d 107, 124 (4th Cir. 2013), quoting *Thomas v. Chicago Park Dist.,* 534 U.S. 316, 323, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002), citations removed.
4 At the Virginia Senate Committee on General Laws and Technology meeting on August 31, 2020, a spokesperson for Attorney General Mark Herring testified that Kevin Wilson, the pastor of Lighthouse Fellowship Church in Chincoteague, had been charged with violating Defendant Northam's order. Enforcement actions against violators of social distancing during protests against Defendant Northam's Executive Order have also been reported ("...Police told attendees that they would issue summonses if they did not spread out.", *Richmond Times Dispatch* article "Dozens protest social distancing orders as Virginia's death toll passes 200", April 16, 2020). There is also widespread public reporting on protests throughout Virginia following the death of George Floyd by protestors whom Defendant Northam supports and who are seen violating the Governor's gathering and social distancing restrictions without any enforcement (see *Virginia Mercury* article "Protest over George Floyd's death spread to Virginia", May 30, 2020, by R. Zullo and K. Masters, which quotes Defendant Northam: "People are crying out for justice and

of Defendant Northam's Order, Plaintiff believes that it would be an error for the Court to accept Defendants' arguments that Defendant Northam's Order is content neutral. Rather, it must be treated as content-based restrictions because of its unequal application by Defendants. In this case, "[l]imitations imposed on speech because of its content are therefore subject to strict scrutiny, that is, no such limitation is valid unless it is narrowly tailored to serve a compelling government interest" (*U.S. v. Mento*, 231 F.3d 912, 918 (4th Cir. 2000), hereinafter, "*Mento*").

9.      Plaintiff's Complaint challenges the compelling interest of Defendant Northam's Order by alleging facts which show that there is no consensus in science for restrictions on all healthy persons (Dkt. 1, ¶¶ 12, 14-18, 44) and that there are alternative means of protecting the healthy population (Dkt. 1, ¶ 44). Plaintiff's Complaint also includes factual allegations showing that Defendant Northam's stay at home orders "are far more sweeping and abusive than any quarantine powers used by elected officials", effectively using a quarantine "against innocent, healthy citizens" in "in any part of Virginia, even in locations which do not show any evidence of the disease" and which fails to provide healthy persons due process rights as required under Va. Code § 32.1-48.05 and Va. Code § 32.1-48.010. (see Dkt. 1, ¶¶ 26, 67)  Plaintiff believes that even though there is a compelling interest in the government responding appropriately to a pandemic, the facts alleged in Plaintiff's Complaint show that there is no reason to find a compelling interest for a government response which is more far reaching than any other crisis in the history of our nation. Even if the Court is persuaded that there is some compelling interest of such immense nature to justify Defendant Northam's action, the government may regulate First Amendment speech under strict scrutiny only "so long as it selects 'the least restrictive means to further the articulated interest.'"[5]  The facts alleged in Plaintiff's Complaint demonstrate that

---

healing...and we have a lot of work to do...." without any report of comments on or enforcement against the gathering and social distance violations during the protests).
5  *Mento*, at 920 (4th Cir. 2000), quoting *Sable Communications of Calif., Inc. v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989).

there are far less restrictive means other than locking down the entire population for many weeks, as Defendant Northam's Order does.

### *Plaintiff is likely to Succeed on the Merits due to an Illegal Quarantine*

10.     Plaintiff's Complaint claims that Defendant Northam is abusing his emergency powers by instituting a sweeping quarantine without probable cause or due process (Dkt. 1, ¶ 67). Defendant Northam's orders violate the First and Fourteenth Amendments by continuing to enforce an illegal quarantine without an order of quarantine as required by the Virginia legislature under Va. Code § 44.146-17 and § 32.1-48.05:

> "...a state of emergency may address exceptional circumstances that exist relating to an order of quarantine or an order of isolation **concerning a communicable disease of public health threat that is issued by the State Health Commissioner** for an affected area of the Commonwealth pursuant to Article 3.02 (§ 32.1-48.05 et seq.) of Chapter 2 of Title 32.1." (Va. Code § 44-146.17, emphasis added)[6]

11.     Defendant Northam's orders continue to violate the First and Fourteenth Amendments through an illegal quarantine which restricts the free travel and assembly of citizens with unwarranted restrictions on the gathering of healthy individuals while providing no due process to persons who are not sick as required under Va. Code § 32.1-48.05 and § 32.1-48.010:

> "A. Any person or persons subject to an order of quarantine...may file an appeal of the order of quarantine as such order applies to such person or persons...." ( Va. Code § 32.1-48.010)

12.     These restrictions on the free assembly of American citizens have been shown to be unwarranted because of recent guidance from medical authorities which have supported

---

6  The Virginia Health Commissioner has issued no order of quarantine yet which either cites Va. Code § 32.1-48.05 or has determined "that exceptional circumstances exist relating to one or more persons...who are known to have been exposed to or infected with...a communicable disease of public health threat and that such...circumstances render the procedures of Article 3.01 (§ 32.1-48.01 et seq.)...to be insufficient control measures" as required byVa. Code § 32.1-48.05.

Plaintiff's arguments that the consensus of science does not warrant restrictions on healthy persons (see section *Relief will not Harm the Public Interest* in Plaintiff's arguments below). Furthermore, these restrictions fail to provide due process and violate equal protection under the Fourteenth Amendment when Defendant Northam failed to enforce his orders on his political allies who were violating the restrictions on outdoor gatherings during past protests in Richmond, Virginia Beach and in Plaintiff's own county of Prince William County.[7] Can the State deprive citizens of liberty and property for quarantine reasons without due process?  For more than a century, the Supreme Court has required equal treatment and due process for U. S. citizens during a quarantine.[8]  Since *O'Connor v. Donaldson*, 422 U.S. 563 (1975), the courts have required due process for administrative actions depriving citizens of liberty in medical confinement and other settings involving deprivation of liberty, summarized in *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004):  "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case'" (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U. S. 306, 313 (1950)).  In *Dorsey v. Solomon*, 604 F.2d 271 (4th Cir. 1979), the Fourth Circuit applied the due process requirements from *O'Connor v. Donaldson* to involuntary detention for medical reasons ("The principles developed in criminal cases apply in this case because involuntary commitment, like incarceration, 'is a deprivation of liberty which the State cannot accomplish without due process of law.', quoting *O'Connor v. Donaldson,* at 580).  How can Governor Northam's orders imposing involuntary quarantine restrictions on the suspected infected not afford the same due

---

7  See footnote 4.

8  See *Jew Ho v. Williamson*, 103 F.10 (C.C.N.D. Cal., 1900) (With "an evil eye and an unequal hand...the denial of equal justice is still within the prohibitions of the constitution."); *O'Connor v. Donaldson*, 422 U.S. 563 (1975) (*Chief Justice Burger concurring* at 580, "There can be no doubt that involuntary commitment to a mental hospital, like involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law.")

process rights as required for the suspected mentally ill under *Dorsey*? Furthermore, the blanket application of quarantine restrictions on all persons without affording healthy persons an individual assessment violates the Supreme Court's definition of due process in *Demore v. Kim*, 538 U.S. 510 (2003), where deprivation of liberty during immigration enforcement cannot be based on blanket assessments, as underscored by your Honor's previous opinion: "even in this narrow subset of circumstances where detention is permissible, the government is generally required to satisfy the burden of establishing that detention is merited in an individual case" *Haughton v. Crawford*, 221 F. Supp. 3d 712, 714 (E.D. Va. 2016). Not only do the blanket restrictions with no individual assessments under Defendant Northam's orders violate due process, the blanket restrictions purposely violate the Supreme Court's requirement for restrictions on liberty under the Fourteenth Amendment to use the "less drastic means for achieving the same basic purpose" (*Shelton v. Tucker*, 364 U.S. 479, 488 (1960)) by defaulting to placing every citizen in every place under a blanket quarantine rather than using any less drastic means to quarantine a communicable disease.

13.    Defendant Northam's current orders are continuing to violate Plaintiff's rights under the Fourteenth Amendment by allowing more than 10 persons to gather at some locations deemed "essential" while restricting other gatherings not favored by Defendants. Defendants have provided no justification showing that the risk to persons in groups more than 10 on private property are more of a threat to public health than the same groups at "essential" businesses. Furthermore, Defendant Northam's current orders during the virus panic continue to enforce an improper use of emergency powers against innocent citizens without due process in violation of the Fourteenth Amendment, similar to how the Exclusion Orders in the *Korematsu v. United States*, 323 U.S. 214 (1944) violated the Constitutional rights of innocent citizens without due process because of the panic of war. During another panic a short time later during the

10

Communist scare of the 1950's, Justice Frankfurter said that due process "is ingrained in our national traditions, and is designed to maintain them" and that "the Court has enforced this requirement by checking attempts of executives, legislatures, and lower courts to disregard the deep-rooted demands of fair play enshrined in the Constitution." *Justice Frankfurter Concurring, Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 161 (1951). The Supreme Court has relied on Justice Frankfurter's concurring opinion in its subsequent guidance on due process requirements for administrative actions by government officials:

> "This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest. Wolff v. McDonnell, 418 U. S. 539, 418 U. S. 557-558 (1974). See, e.g., Phillips v. Commissioner, 283 U. S. 589, 283 U. S. 596-597 (1931). See also Dent v. West Virginia, 129 U. S. 114, 129 U. S. 124-125 (1889). The 'right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.' *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring)" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)

14.     This fundamental requirement for due process from *McGrath* has been echoed in the Fourth Circuit: "The essential requirements  of procedural due process are notice and an opportunity to be heard. See *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 178, 71 S.Ct. 624, 95 L.Ed. 817 (1951)." *Rosenfield v. Wilkins*, 280 F. App'x 275, 284 (4th Cir. 2008). Can Defendant Northam use his emergency powers to deprive all citizens of Virginia their liberty and property rights without due process as required by *Joint Anti-Fascist Refugees Committee v. McGrath* and Virginia law? If the Court denies the present request for preliminary relief, Plaintiff's right to due process will continue to be denied and the Defendants will be allowed to ignore the "deep rooted demands of fair play enshrined in the Constitution". *McGrath* at 161.

### *Plaintiff is likely to Succeed on the Fourth Amendment*

15.     Defendant Northam's orders continue to violate Plaintiff's rights under the Fourth Amendment by perpetuating the Governor's improper extension of the State's authority to

11

how persons exercise their constitutional rights on their private property (Dkt. 1, ¶¶ 52-54).

The only justification for the extension of State powers against private actions on private

property which are not subject to business licensing are for law enforcement purposes during the

commission of a crime (see *Jones v. United States* 357 U.S. 493 (1958); *United States v.*

*Rabinowitz* 339 U.S. 56 (1950)) or when the legislature has determined that there is a direct and

immediate threat to public safety (see *Camara v. Municipal Court,* 387 U.S. 523 (1967)).

Defendant Northam has no such justification to extend police powers onto Plaintiff's property.

For these reasons, Defendant Northam's current orders exceed the limits to the authority of the

State and infringe on the right of citizens to be secure in their person, houses, papers, and effects

under *Jones, Rabinowitz* and *Camara.*

16.     Furthermore, the police power of the State found in *Jacobson v. Massachusetts,*

197 U.S. 11 (1905), in the interest of public health does not empower a violation of the rights of

citizens on private property under the Fourth Amendment because: i) the facts in *Jacobson*

involved State action against citizens outside of their private property and was based on the

Fourteenth Amendment, not the Fourth Amendment; ii) even in *Jacobson,* the Court found that

"the mode or manner of exercising its [the State's] police power is wholly within the discretion

of the State so long as...any right granted or secured thereby [the Constitution] is not infringed",

*Jacobson,* at 11; iii)  the *Jacobson* Court was not dealing with a Governor's Executive power as

in this case, but with the State power enacted by the legislature, stating: "[i]t is within the police

power of a State to enact a compulsory vaccination law, and it is for the legislature,

and not for the courts, to determine", *Id.,* at 11; iv) even if this Court finds the police power of

the Executive for public health reasons supported by *Jacobson,* such powers are not proper when

the Executive circumvents and/or purposely violates the requirements and intentions of the

12

legislature for use of that power to enforce an illegal quarantine during a public health emergency, as in Plaintiff's case.

17.     In *Diocese of Brooklyn,* Justice Gorsuch noted that *Jacobson v. Massachusetts,* 197 U. S. 11 (1905) was decided concerning a Fourteenth Amendment question and that constitutional questions about rights under other Amendments besides the Fourteenth (like Plaintiff's complaints under the First and Fourth Amendments) should not rely on *Jacobson* because it "involved an entirely different mode of analysis, an entirely different right, and an entirely different kind of restriction." (*Justice Gorsuch concurring, Diocese of Brooklyn,* p. 3) Justice Gorsuch's opinion clearly applies to Plaintiff's complaints under the First Amendment. But they also apply to Plaintiff's complaints under the Fourth Amendment to be secure in his persons, houses, papers and effects.  As noted in Justice Gorsuch's opinion concerning *Jacobson's* substantive due process right to bodily integrity:  "what does that have to do with our circumstances?". (*Id.,* p. 4)  For the above reasons, Defendant Northam's orders continue to violate Plaintiff's rights under the Fourth Amendment.

## *Defendant Northam's Orders cause Irreparable Injury*

18.     Defendant Northam's Orders are continuing to abridge Plaintiff's constitutional rights under the First, Fourth and Fourteenth Amendments, *supra.*  The disparate treatment of religious services and similar non-religious activities under Defendants' orders can still lead to Plaintiff suffering criminal penalties which are not justified under strict scrutiny standards.  The restrictions on "time, manner and place" of Plaintiff's free speech, travel and assembly under Defendant Northam's orders are designed to apply to those activities which the Governor defines as essential or non-essential and are also applied selectively to Defendant Northam's political supporters as noted by Plaintiff at the time of his Complaint and since then during the protests

against racial injustice, *supra*. These restrictions on free expression of Plaintiff are unconstitutional because they are not content-neutral for these reasons and are not justified by a compelling interest nor are they narrowly tailored enough to allow them to avoid injury to Plaintiff's rights. As noted in *Diocese of Brooklyn*, "'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irrep-arable *[sic.]* injury" (quoting *Elrod v. Burns*, 427 U. S. 347, 373 (1976) (plurality opinion)). The unconstitutional restrictions on Plaintiff's First Amendment rights under Defendant Northam's current orders constitute such irreparable injury as called for in *Elrod*.

19.    Similarly, Defendant Northam's orders also cause irreparable injury to Plaintiff's Fourth Amendment rights. Not only has Defendant Northam's orders prevented Plaintiff from exercising his right to freely use his private property on several occasions since their inception, Plaintiff continues to be under the threat of prosecution if he should try to use his property contrary to the Governor's orders. These restrictions are unconstitutional incursions by the State which are depriving Plaintiff of his right to be secure in his home, property, papers and effects without probable cause and which are not justified as a proper use of police powers under *Jacobsen, supra*. In the case of probable cause cases like *Jones* and *Rabinowitz*, even a single violation of a citizen's rights under the Fourth Amendment cause sufficient irreparable harm to cause police action to be outlawed and enjoined in the future. Such injunction should apply to the unconstitutional restrictions which have violated Plaintiff's Fourth Amendment rights on more than a single occasion. Even if the "minimal" loss of Plaintiff's rights under the Fourth Amendment do not justify an injunction as in *Elrod*, the fact of the matter is that Defendant Northam's orders have already unconstitutionally extended the police powers of the State to injure Plaintiff's private property rights for many months, are continuing to cause injury under the current orders, and promise to continue to cause injury to Plaintiff's rights for many months

14

to come if the Court does not take action.

20.     Furthermore, Defendant Northam's orders continue to violate Plaintiff's due process and equal protection rights under the Fourteenth Amendment, *supra*.  The Court should not tolerate the trampling of due process rights and equal protection under the Fourteenth Amendment any more than minimal loss to First Amendment freedoms because due process and equal protection are fundamental to the protection of all other civil rights provided by the Constitution.  The irreparable injury which Defendant Northam's orders are causing to Plaintiff's rights should justify preliminary relief.

### *Relief will not Harm the Public Interest*

21.     As noted in *Diocese of Brooklyn*, the Court should not automatically accept that anything done during a pandemic has the effect of barring injunctive relief ("...the State has not shown that public health would be imperiled if less restrictive measures were imposed....even in a pandemic, the Constitution cannot be put away and forgotten.", *Diocese of Brooklyn*, p. 5).  At the time of Plaintiff's Complaint, there was no consensus of medical science showing that "the transmission of COVID-19 from a healthy person or an asymptomatic person who may have the virus is a definite mode or threat of transmission" (Dkt. 1, ¶ 17).  Defendants have yet to provide irrefutable medical evidence to rebut this.  Any claim that transmission of the virus occurs when infected persons do not have symptoms (either asymptomatic or presymptomatic) has not been conclusively demonstrated by the data or the studies relied upon.  Furthermore, it is indisputable that healthy persons, without infection, cannot transmit the virus and depriving healthy persons of liberty due to the virus is not justified by the science for this reason.

22.     On June 8, 2020, the World Health Organization's leading epidemiologist reported at a press briefing that transmission of COVID-19 by asymptomatic persons is "very

rare" based on the data to date.  Subsequent comments by Dr. Van Kerkhove underscored that there is no consensus of science concerning asymptomatic transmission, stating that there is no clear answer on whether COVID-19 is spread by asymptomatic persons.[9]  Furthermore, as noted in the study referenced by the American Medical Association, or AMA, (Ferretti, *et al.*) : "The most accurate and robust quantification of the relative frequency of routes of transmission [including asymptomatic and presymptomatic transmission] would be a well-designed prospective cohort study with detailed journal and phylogenetic investigations."[10]  No such study which would scientifically demonstrate asymptomatic or presymptomatic transmission has been accomplished to date.  As noted in Ferretti's study, the studies relied upon during the current global emergency requires the use of studies "using imperfect data".[11]  All epidemeological studies to date are limited by error from the "imperfect data" which is inherent in non-clinical studies.  It is noteworthy that in its brief referencing the latest medical science, the AMA[12] references the epidemiological study Xi He *et al.*, *Temporal dynamics in viral shedding and transmissibility of COVID-19*, 26 Nature Medicine 672 (2020), but Xi He's study itself documents the typical limitations of these non-clinical studies, stating:

> "...symptom onset relies on patient recall after confirmation of COVID-19.  The potential recall bias would probably have tended toward the direction of under-ascertainment, that is, delay in recognizing first syptoms....However, the incubation period would have been overestimated and thus the proportion of presymptomatic transmission artifactually inflated."  [Xi He, p. 674]

> 23.    The negative serial interval used to estimate presymptomatic infections in

---

9  See Time article at https://www.time.com/5850256/who-asymptomatic-spread/
10  Ferretti, L., *et al.*"Quantifying SARS-CoV-2 transmission suggests epidemic control with digital contact tracing", *Science*, May 8, 2020, 368:6491, p. 2., referenced in Brief of the American Medical Association and the Medical Society of the State of New York as *AMICI CURIAE* in Support of Respondent, *Diocese of Brooklyn v. Governor Cumo*, 592 U. S. ____ (2020), fn 5.
11  Ferretti, L., p. 2.
12  Brief of the American Medical Association and the Medical Society of the State of New York as *AMICI CURIAE* in Support of Respondent, *Diocese of Brooklyn v. Governor Cumo*, 592 U. S. ____ (2020), fn 5.

Xi He's study is directly affected by any of this error in the estimated incubation period.

24.     Furthermore, more recent epidemiological studies of COVID-19 populations have been more rigorous than Xi He's study and have shown that there is either no risk of asymptomatic transmission or the estimated rate of asymptomatic transmission is an exceedingly small fraction of symptomatic transmission.[13]  Even if the Court does not find the recent evidence as definitive, it should be clear that the consensus of science is on the side of Plaintiff's arguments and there is little justification for Defendant Northam's restrictions on persons without symptoms, and even less for healthy persons who have not been exposed but are still quarantined under the Virginia orders.

25.     Defendant Northam's own actions should convince the Court that relaxation of the restrictions on Plaintiff's First and Fourth Amendment rights should not be harmful to the public.  Defendant Northam has never applied the quarantine restrictions to those working in what he defined as essential services, allowing those persons to work in groups of any size: "The presence of more than 10 individuals performing functions of their employment or assembled in an educational instructional setting is not a 'gathering.'".  (Dkt. 49, Exhibit G, p. 12)  If healthy or asymptomatic persons were never a risk to public health at places defined as essential, it begs the question why gatherings of persons at non-essential activities, at religious services or on

---

13  Zachary Madewell, *et al.*, "Household Transmission of SARS-CoV-2", JAMA Network Open. (2020) 3:12, found that the asymptomatic transmission was more than 25 times less than the number of transmissions from subjects with symptoms, finding: "The lack of substantial transmission from observed asymptomatic index cases is notable";  Shiyi Cao, *et al.*, "Post-lockdown SARS-CoV-2 nucleic acid screening in nearly ten million residents of Wuhan, China", Nature Communications (2020) 11:5917, found that there were "no positive tests" out of 1,174 "close contacts" of 300 asymptomatic cases. "Compared with symptomatic patients," the authors wrote, "asymptomatic infected persons generally have low quantity of viral loads and a short duration of viral shedding, which decrease the transmission risk of SARS-CoV-2.";  Lei Luo, *et al.*, "Contact Settings and Risk for Transmission in 3410 Close Contacts of Patients With COVID-19 in Guangzhou, China", Annals of Internal Medicine, 12/1/2020, found that transmissions from asymptomatic subjects was 11 times less than transmission from those with even mild symptoms.

private property should be restricted in any way differently than those at essential businesses. The disparate treatment between the activities which Defendants arbitrarily designate as essential from other activities shows that Defendants themselves do not believe that the risk to public health is appreciably affected by size restrictions when other controls and science-based, less restrictive measures are in place.

26.     For the foregoing reasons, the Court should find that the public will not be imperiled if restrictions on healthy persons are lessened. Even if the Court is not persuaded that restrictions on healthy persons can be removed, it should be clear that there is little justification for Plaintiff's exercise of his religious, speech and assembly and private property rights should be restricted any more than how activities at essential businesses are restricted.

## Preliminary Relief is Proper

27.     Plaintiff's arguments have demonstrated how preliminary relief is proper because his Complaint is likely to succeed on the merits under the First, Fourth and Fourteenth Amendments, Defendant Northam's orders are continuing to inflict irreparable injury to Plaintiff, and that preliminary relief which allows healthy persons to exercise their constitutional rights is not expected to cause harm to the public. For these reasons, Plaintiff believes that the current Motion satisfies the conditions for a preliminary injunction according to *Winter* and Plaintiff respectfully requests the Court to grant Plaintiff such preliminary injunction, which either fully or partially stays Defendant Northam's violations of Plaintiff's constitutional rights.

## CONCLUSION

28.     For the foregoing reasons, Plaintiff's request for preliminary relief is timely and proper, during the time that the Court considers Defendants' Motion to Dismiss and thereafter. Plaintiff respectfully requests that the Court grant without further delay a full or partial stay of Defendant Northam's orders in order to address ongoing injury to Plaintiff's constitutional rights and enjoin Defendants from issuing any further orders which harm Plaintiff's constitutional rights.  A proposed Preliminary Injunction Order is provided in the Appendix for consideration of the Court.  If the Proposed Preliminary Injunction Order is not approved by the Court, Plaintiff respectfully requests that the Court order other appropriate preliminary relief which enjoins the civil and criminal enforcement of Defendant Northam's current or future orders against Plaintiff's exercising of his constitutional rights under the First, Fourth and Fourteenth Amendments.

Dated:  February 6, 2021

Respectfully submitted,

By:  _____

James Tolle
*Pro Se*
11171 Soldiers Court
Manassas, VA 20109
703-232-9970
jtmail0000@yahoo.com

## CERTIFICATE OF SERVICE

I certify that on this _____6th_____ day of _____February_____, 2021, a true copy of the

foregoing Motion for Preliminary Relief was mailed via U. S. mail, first class, postage prepaid

to all parties or counsels of record as appropriate for Fed. R. Civ. P. 5(b).

Respectfully submitted,

By: _____

James Tolle
*Pro Se*
11171 Soldiers Court
Manassas, VA 20109
703-232-9970
jtmail0000@yahoo.com

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

JAMES TOLLE,                                                      Civil Action No. 1:20-cv-00363

                 Plaintiff,

   v.

GOVERNOR RALPH NORTHAM and the COMMONWEALTH OF VIRGINIA

               Defendants.


**LOCAL RULE 83.1(M)
CERTIFICATION**

**I declare under penalty of perjury that:**

**No attorney has prepared, or assisted in the preparation of this document (the present motion).**

James Tolle
-----------------------------------------
Name of *Pro Se* Party


-----------------------------------------
Signature of *Pro Se* Party

Executed on: _February 6, 2021_

21